Number 25-2899, District of Minnesota, Female Athletes United v. Keith Ellison et al. Good afternoon, your honors. May it please the court, Hal Frampton on behalf of Female Athletes United. I'm going to try and reserve five minutes for rebuttal this afternoon. Title IX gives girls the right to equal athletic opportunity. Unfortunately, the Minnesota State High School League has eroded that right by allowing males who identify as female to play in girls' games and win girls' championships. Last season, the softball-playing members of Female Athletes United watched a team powered by a male athlete run over them in game after game on the way to a state championship. And with softball season set to begin in early March, the only thing that can stop history from repeating itself and secure their right to fair competition this season is a preliminary injunction from this court. As is often the case when a preliminary injunction is on the table, the key issue in this appeal is the merits, whether the league's bylaws violate Title IX. If they do, essentially everything else in our argument flows from there. And so that's where I would like to start. And I'll say two preliminary things as we begin to get into the merits. Number one, what is not contested in this case, and that is that when Title IX uses the word sex, it's talking about biology. We've argued that throughout this case, and in footnote 13 of the state's brief, they say they're preserving it for further review, but they're not arguing that issue here in front of this court. The second preliminary thing is that as I talk about the merits, I'm going to do sort of a deep dive into the athletics regulation. 10641. And the reason that I'm doing that in sort of a post-Loper Bright world is that the Title IX athletics regulations bear the imprimatur of Congress in a way that ordinary regulations do not. Via the Javits Amendment, which specifically directed that the Department of Health, Education, and Welfare adopt regulations taking account of the nature of particular sports, recognizing that applying a nondiscrimination on sex law in the context of athletics is sort of a complicated business. The Department promulgated those regulations. They went to Congress for review. Congress allowed them to take effect. And then not only that, but after the Supreme Court in the Grove City College case effectively rendered them moribund, Congress resurrected the regulations through the Civil Rights Restoration Act of 1987. So those regulations are in a slightly different posture. And if we look at 10641 itself, it's got three subsections, A, B, and C. A is a general nondiscrimination requirement that says no sex discrimination, no sex separation whatsoever. Subsection B then says, okay, there's a safe harbor. In the context of contact and competitive sports, you can have sex-separated teams. And then subsection C is an overarching requirement that recipients provide equal athletic opportunities to both sexes. I think there are two types of violations going on here with the bylaws that are issued. One is an A-B violation, and I'll talk about that one first. The other is a C violation. I'd like to back up just a little if I could. Sure. I'm interested in your marriage arguments, but to me a threshold issue here is whether you have a disparate treatment claim or a disparate impact claim. And I think you do not contest the fact that there is no private cause of action for a disparate impact claim. We don't contest that there's no disparate impact claim under Title IX, but this is not a disparate impact claim. And I think you can get there in a few ways. I'll start with two. The first is that when you've already got a sex-conscious system, and athletics is already a sex-conscious system. You've got girls' sports and boys' sports. When the high school league comes in and starts tinkering with that system, that tinkering is necessarily sex-conscious. And that's what cases throughout our brief have noted. The Beidinger case says, okay, you can apply, for example, and across the board cut to the athletics departments and cut both girls' teams and boys' teams, but by choosing to cut a girls' team, that's a sex-conscious decision that gives rise to a disparate treatment claim. The same thing is going in here. When you make the decision to allow some boys to come into girls' sports, that's a sex-conscious decision. It's even more sex-conscious than the across-the-board cases because the bylaw change here only affected girls' sports. Boys' sports were already open to all comers. So when the high school league says in 2014-15, we're now going to allow people to participate on the basis of gender identity, that is only a change as to girls' sports, and that by itself is sex-conscious. The cases from this court have been crystal clear that you don't need any kind of animus to make out a disparate treatment claim. You just need a difference in treatment, and that's what we have here. We're going to make a change to girls' sports. There are no changes to boys' sports. That's disparate treatment. But aren't the bylaws themselves gender-neutral? Your Honor, they are dressed up in facially-neutral language, but in order to give account to that, you would have to elevate form over substance. You'd have to ignore the fact that even though they're dressed up in that language, they didn't make any change to boys' sports. And you'd have to ignore the fact that, again, we're already in a sex-conscious system where anything you do to a girls' team is sex-conscious in and of itself. So, Your Honor, I don't think we're dealing with a disparate impact claim here. And I think, frankly, that's why my friends on the other side didn't even argue that in front of the district court. They never claimed that this was a disparate impact claim. That was something the district court did on its own, and, frankly, I think it was erroneous. Well, Your Honor, if we can move back to the merits, let me start with the A-B violation. And that is that if you look at A and B, B is a safe harbor to A. A and B are symbiotic. That's out of the Mercer against Duke University case out of the Fourth Circuit. And, essentially, they set up a two-lane highway. Every component of a recipient's athletic program has to either qualify for the safe harbor in B, or it's got to roll up and comply with the nondiscrimination requirement in A. And the problem here is that softball does neither. You might think that it would qualify for the safe harbor in B because it's designated as a girls' team. That would be the natural assumption. But then, of course, they allow boys to play, so it's not a separate team for girls. So it doesn't qualify for the safe harbor, and Mercer says that as well. It says that as soon as you allow a member of the opposite sex to try out for a team, it's not a subsection B team anymore. It's got to comply with subsection A. But softball doesn't do that either. Boys who identify as boys are not allowed to play. There's differential treatment on the basis of sex. So it's not in the A lane. It's not in the B lane. It's off the road in a regulatory no-man's-land ditch. And for that reason alone, the bylaws violate the regulations and violate Title IX. You don't ever have to get to see. And let me provide an example. Imagine that a recipient said, Girl's softball is for girls. Any girls can try out. But also any boys who have green eyes. That analytically is the same as the policy that we're dealing with here because gender identity isn't a concept that Title IX recognizes. Title IX is a sex discrimination statute per the state's concession in footnote 13. And I don't think under my example we'd have any trouble concluding that that kind of a team is off the regulatory roadmap entirely. So that's the AB violation. And everything that I'm saying is reflected in the findings from the Department of Education. The regulatory authorities agree with that analysis. And it's not a purely technical analysis because it actually makes sense. The only reason that we have B, the only reason we allow sex separation at all in the context of an anti-discrimination statute, is that Congress, via the Javits Amendment, and the regulators originally at HEW recognized that in the context of contact in competitive sports, boys and girls are not similarly situated. That's why you can separate them on a non-discriminatory basis. But as soon as you then allow boys back into that girls' team, the entire justification for sex separation falls away, and you might as well be in my example where you're allowing the green-eyed boys to play too. So that's violation number one. There's a second category of violation, and that's the subsection C violation. The equal athletic opportunity. And I think that you can get there a couple of ways. One, you can get there on the face of the regulation itself. The bylaws don't accommodate the interests and abilities of girls because they're allowing boys to come in and take girls' opportunities and win girls' championships. That by itself on the face of the regulation is a violation. I also think you can get there via the 1979 policy interpretation, which this court has said is a court-at-hour deference, and that's a post-Kaiser decision, so it's still good law. That's the Burnson case. And there are two places in the policy interpretation where you're going to find a violation. One is the very same section that the Burnson case looked at. That's the selection of sports criteria in Roman numeral 7, uppercase C, lowercase B, 4. Sorry for the alphabet soup. I didn't write the policy interpretation. The selection of sports section says that in a non-contact sport, and I'll just assume for purposes of argument that softball is non-contact. I don't think the analysis changes either way. But in a non-contact sport, if you've got a boys' team, and we have a boys' baseball team, then you've got to have a comparable girls' team if three things are true. Number one, opportunities for girls were historically limited. We know that's true. This court said it in the Diem case, and no one disputes it here. Number two, you've got to have sufficient interest to field a girls' team, and the popularity of fast-pitch softball for girls across Minnesota demonstrates that that one is satisfied, and no one disputes that either. And third, you've got the excluded sex, that's girls, have to lack sufficient skill to compete actively on boys' teams. And that's why we provided the court with a comprehensive expert report from Dr. Greg Brown that demonstrates all of the ways that high school boys are going to have substantial athletic advantages over high school girls, such that in a sport like baseball, girls are not going to be able to compete actively. And the district court actually said that that basic science really isn't disputed. And we agree. So all three of those criteria are met, and right there on the face of the policy interpretation, you have a subsection C violation. In addition, if you look at the overall compliance factors that are in Roman numeral 7, uppercase B, 5, you see a violation there as well. We don't need that because we've got selection of sports, but we also have it. And that lists three overall compliance factors, any one of which you can find a violation. One is, is the policy discriminatory in language or effect? Yes, it is. It takes away girls' opportunities. It has absolutely no effect on boys' opportunities. Number two, and I'm taking them out of order intentionally, is there a substantial disparity in an individual program segment? Well, yes. Softball is no longer a purely girls' sport, and we have evidence in this case of a talented biologically male athlete powering a team to a state championship. So yes, there's a substantial disparity in that very program segment. Another factor is, are there disparities of a substantial and unjustified nature in the program as a whole? Well, yes, because the bylaws affect every single girls' sport that the high school league sponsors. On their face, they have a system-wide effect. That's the entire point, is that they were trying to allow boys who identify as girls into girls' sports. So yes, there's a system-wide effect. So in both instances, you've got a subsection C violation. And, Your Honor, once you've got that straight and once the merits are in our favor, all of the other data face factors follow from there. Is there irreparable harm? Yes. The quality of the harm is irreparable because everyone recognizes that athletic contests are one and done. You can't go back and replay them, and you can't do any money damages are not going to fix that. That's what irreparable harm is. Can I go back briefly to Judge Grass's inquiry on whether there's a private right of action? I think you've conceded disparate impact won't work, which I think leaves you in the land of intentional discrimination. Yes, Your Honor. So what in the record or in the pleadings suggests that these bylaws stem from the appellee's intent to discriminate rather than a nondiscriminatory consideration, such as a sincere belief that letting transgender students compete in team sports wouldn't have a significant effect on female high school athletes? Well, again, Your Honor, we don't need animus. We just need an intent to change the rules for girls, and that is exactly what we have here. You might not need animus, but you need an intent to discriminate, right? We need an intent to treat girls differently. Okay. And we have that. They're letting boys into girls' sports. That's treating girls differently. The background knowledge against which Title IX was written, and it's in case after case, the O'Connor case, Justice Stevens and Chambers, is that males have biological advantages over females. And so I'm sorry, Your Honor, I don't need that. Well, okay. I guess is there evidence, is there something in the pleadings that suggests that they knew that at the time they incorporated these bylaws? Your Honor, I think I'd say a couple of things. Number one, deliberate indifference is enough. And, yes, I would say the entire background against which the regulations were written recognizes that biological males have athletic advantages over females. It's reflected in the case law. Second, I would say that certainly by the time the current administration started putting them on notice and saying, this is hard on girls, and they didn't change anything. I saw that argument. Are you sure that argument works? Because what if the next administration, which I think the one before, had a completely different position? Is it going to change with administrations? Well, it isn't, Your Honor, because ultimately it comes down to what Title IX requires. And what we have articulated is a number of straightforward violations of the athletics regulations that have been on the books for 50 years. So there's clearly notice that those exist and that if you fail to comply with them, you're violating Title IX. Your Honor, I'm at my five minutes, so I'd like to reserve the rest of my time for rebuttal if there are no more questions at this time. Very well, thank you. Thank you, Your Honor. Thank you. Good afternoon. May it please the court. My name is Liz Kramer. I'm Minnesota's Solicitor General, and I'm here on behalf of state appellees today. Judge Toster did not abuse his discretion in denying the preliminary injunction. Even after resolving all disputed factual issues in favor of FIU, he found that all four data-based factors weighed against a preliminary injunction. FIU simply had not, and has not, met its burden to change the status quo. I plan to address three legal issues that go towards FIU's failure to establish a likelihood of success, and leave irreparable harm and other equitable issues to Attorney McKelmont. Those three issues start with where Your Honors were just asking questions about the private right of action under Title IX, and then I'd like to talk about the clear notice requirement that stems from the spending clause, and finally, standing. So, private right of action. FIU simply has not effectively responded to Justice Scalia's decision in Alexander v. Sandoval. That decision says that the rights-creating language in Title IX, which is the same as in Title VI, only creates a private right of action for intentional discrimination. Well, I think they basically conceded that today, didn't they? They did. And so, the next logical piece of that for me, Your Honor, is that there is no evidence of intentional discrimination here, or even sex-conscious discrimination, because that seems to me like what my friend on the other side was trying to get at, the sex-conscious discrimination. Here, the league policy is absolutely gender-neutral. It says all students may participate consistent with their gender identity. And I want to remind this Court that the policy is not just about athletics, but also about fine arts and about speech and debate. So, the idea that FIU is putting forward that, of course, everyone adopted this policy with some kind of deliberate indifference to discrimination, or an intent to discrimination, is actually belied by the record. So, the policy, the bylaw that the league has, begins with the language that it is intended to bring the league rules and policy in line with state and federal laws and regulations. That's why it was adopted. And because no discovery has been done, we're here on preliminary injunction, there's nothing to suggest otherwise. Furthermore, even if this bylaw were only about athletics and somehow had only affected girls' sports, which, again, is not true, there's no evidence that anybody in 2015 would have known that transgender girls might play varsity sports, or how many of them there might be in 2025, or if at any point. And I'll note that the record here only discloses the participation of one transgender girl athlete in all of Minnesota girls' softball. The argument I heard, I think, was that the bylaw on its face only affects girls' sports programs. And I think what I heard is that because girls were always allowed to participate in male sports. Did you catch that argument, and what's your response to it? Judge Grundy, I did catch that argument. This is one place where we're all at a disadvantage because we're here on a preliminary injunction posture, and we were not allowed to conduct discovery below. So it is true that Minnesota statutes essentially follow Title IX. So we have our own statute that is very similar to Title IX. And one piece of that is it says where there are sex-segregated sports, so for example, like only boys' football, and it's a sport where the other sex has traditionally been excluded, they should be allowed to try out. So that statute, I agree, exists. We don't know how it's ever been used. We don't know how often that happens. And honestly, at the top of my head, I don't know when that statute was put into place and how that aligns with either Minnesota's 1993 Human Rights Act, which I think is what required this bylaw to change for the league, or the 2015 bylaw itself. So there's simply not enough evidence in the record to make the representation that Mr. Frampton just did. Ms. Kramer, what if there is no smoking gun evidence of intentional discrimination, but it's just common knowledge or common sense that the bylaw change would disadvantage girls? There's a case, you're probably very familiar with it. So this is really nothing new, I guess. In 1980, Justice Stevens in O'Connor v. Board of Education said that without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events. And as you know, Title IX requires equal opportunity. And he was expressing the view 46 years ago that he understood that if boys were playing a girl's sports, it would deny girls an equal opportunity. So even if there's no evidence of a smoking gun, isn't it just kind of common sense or common knowledge that it would disadvantage girls? Judge Gross, there's no evidence of common knowledge here, and in fact the scientific evidence runs counter to what this common knowledge was in that opinion that is nearly 50 years old. And I'll note that even in the U.S. Supreme Court arguments just on Tuesday, a lot of the justices as well as the advocates were talking about the problem of scientific uncertainty in this area. And that in particular, there has been very little research done on the comparative athletic abilities of trans girls and cisgender girls when trans girls have undergone some puberty blockers or otherwise not gone through male puberty or had that testosterone boost. So whether people in 1980 thought it was common knowledge or not, the record here shows that even FAU's expert said there has not been sufficient research done on this subcategory of trans girls, those who have, again, had puberty blockers, and whether they have any athletic advantage at all or in fact whether they might be disadvantaged. So I want to move on to the clear notice issue because even if you disagree with me on the disparate impact... One other question. Of course. How do you read our decisions in Ports and Bernsden and Chalinar? If we were to affirm the district court's private right holding, would we be calling those cases into question? No, Your Honor. Those were sex conscious decision making and those talk about it. So Ports, which Minnesota was involved with, cut an entire girls team. So as I recall, it cut one girls team and then another girls team was applying the laundry list of factors and said, we have worse fields, we have worse locker rooms, we get to travel less. So they were undergoing the appropriate kind of laundry list analysis that this court has approved and that the regulations call for. So on clear notice, just quickly, the plain text of Title IX does not speak to how educational institutions should accommodate transgender athletes or students. And no court in the country has said that Title IX requires discriminating against those transgender athletes. So with that and with the flip-flopping guidance from the past 12 years of federal administrations, there is not enough to say that Minnesota was on clear notice that we couldn't abide by our own state human rights act here. And so the claim also fails on that basis. And then finally on standing, just want to remind everyone that because we're here on a preliminary injunction, Murthy requires a clear showing of standing. And because they, again, want forward-looking relief, they have to show harm is certainly impending. And none of the four athletes that are members of FAU have met that showing. I thought that athlete number one was scheduled to play DOE in May. She is scheduled. Her team is scheduled to play DOE's team in April or May, Your Honor. I can't remember because I know the date moved. But there's no certainty that either of them will play. Elite athletes get injured, so that's possible. It's also not certain that DOE's team will win. You've seen the declaration from her coach that they lost a lot of their valuable players. And I want to reiterate that there's no evidence here that DOE's skill as a pitcher is far and above. For standing purposes, is likelihood of winning a relevant factor? Only because that's what they're saying their injury is. Their injury is that they're saying it's unfair competition, that they're likely to lose, or that it's unsafe. And so I just want to reiterate, there's no evidence in the record to support either of those things being tied to DOE's transgender status. And with that, I want to make sure that Attorney McKelvin. Let me ask one other question real quick. Yes. Would this case be mooted by a stipulation that DOE wouldn't play in the scheduled game? If this court were to continue and affirm the district court's decision that standing is based only on that one athlete's game, then yes, it would open itself up to that kind of gamesmanship. Which is, I think, one reason that that's not a sufficient basis for standing. Okay, thank you. So I'd like to reserve the rest of the time for Ms. McKelvin. I think she might have an additional five minutes if you... Oh. Am I right, Ms. Bindler? That's correct. She has five more minutes. So you may... Then I'm happy to still be here. Well, you can yield it. Sorry that I was eager to go. You can yield it, but you don't have to. No, no, no. Then she'll have eight. Just wasn't... Anyway. So you all were asking me about standing. FAU's replies to our standing arguments have largely been this general idea that for standing we have to accept their theory on the merits and then apply that to the question of injury. And it's absolutely true, we must accept their theory of the case, but we don't have to accept their facts supporting that theory as a given. They have to establish those. So here their theory of the case is that Title IX can prohibit one transgender athlete if somehow that establishes an unfair or unsafe participation environment for these cisgender athletes. Isn't that mixing the merits with standing? It seems, your argument just now, it seems to me you're mixing the merits with standing. Well, it's partly because the way they have posited their injury, your honor. So their injury is only the playing. And so that is causing this overlap between the merits and the standing a little bit. But again, I'm saying even if we accept their theory on the law, they have not put forward any evidence that playing games against Doe in a team sport is actually unfair in any way. So, for example, there's no evidence that Doe is taller or longer limbed or has more grip strength than any of the four FAU athletes. Or that her performance is so far and above these other, honestly, elite softball players. They are all elite girls softball players. And even if there were that evidence of extraordinary elite, you know, above and beyond performance, there's certainly no evidence linking that to her transgender status in a way that I think you would have to do here to say that they're injured simply by playing the one game. So, unless the court has further questions, the state, I believe, has asked the court to affirm the district court. And now I will yield the rest of my time to Attorney McAllen. Thank you, Ms. Cranmer. That doesn't happen very often that you pick up time, so good for you. I don't think it's ever happened to me before, Your Honor, so I'll take it. May it please the court, my name is Virginia McAlmont, and I represent the public school district where Jane Doe is a student. Regardless of this court's decision on whether FAU has shown a likelihood of success on the merits of its Title IX claim, the district court's discretionary decision not to issue a preliminary injunction in this case should be affirmed. In opposing counsel's argument, I heard him say at the beginning, I wrote it down, that the key issue is the merits and everything else flows from there. With respect, that's incorrect. Recently, in the Hotchkiss case, this court said explicitly, quote, a preliminary injunction does not follow as a matter of course from a likelihood of success on the merits. As this court knows, there's not one data phase factor, there's four. And in this case, the district court found that each and every single one of those data phase factors counted against or weighed against the entry of a preliminary injunction here. That's a discretionary determination that this court should not disturb. I'd like to address briefly the three non-merits-based data phase factors in order, starting with irreparable injury. The injury that FAU alleges here is novel. We're not talking about a complete inability to participate. As the district court said, FAU itself acknowledges that if an injunction is not entered, its members will be able to play softball this season. They'll be able to try out and be rostered and compete, just like anybody else in the state of Minnesota. We're not talking about that complete exclusion that this court saw in Ng and Ports and DM. Instead, we're talking about a reduced likelihood of success, and that is just not an irreparable injury. I'm not sure that's exactly true. I know that in the state of NAL, there was a Big Ten school that paid a million dollars for a softball pitcher. So if some of those statistics are hampered by even one game, it could potentially cause irreparable injury. Could it not? I would respectfully disagree, Your Honor, which is not to say that it isn't an injury, but I do not believe that it's an irreparable one, warranting the extraordinary relief of a preliminary injunction. Records can be changed. Money damages exist. That's presumptively what people are entitled to when they come to court. In the example Your Honor gave, there's an explicit dollar figure tied to whatever the loss may be. So, again, I think those are all issues that can be addressed in the context of the merits and relief, if that's appropriate, but do not speak to whether this is an irreparable injury warranting the entry of a preliminary injunction. Also, I'll turn to the public interest. As this court knows, the policy interests in this case are hotly disputed. The district court observed that. I was actually intrigued myself to hear in the arguments that General Kramer referenced at the Supreme Court earlier this week. Justice Kavanaugh makes some comments that I think are exactly what the district court was getting at here. Justice Kavanaugh said, quote, there are strong assertions of equality on both sides, and he and other members of the Supreme Court expressed concern about federalizing in an area where states are divided almost exactly 50-50 on the question of whether transgender athletes may or must be permitted to participate. This is a particular concern in an area where, as General Kramer noted, there is scientific uncertainty around the impact of medical interventions, and with respect, these are exactly the reasons why a preliminary injunction isn't appropriate here. Further development and a greater factual record and merits-based determinations is what should follow. Finally, on the balance of harms, I'll note that this court has said basically any one of the data-based factors can be sufficient on its face. In the case of balance of harms in Hill v. Zagwad, a case that we cite in our briefing, this court presumed that the other three factors all weighed against entry of a preliminary injunction and still found that the balance of harms meant that an injunction should not enter, and that is precisely the situation that we encounter in this case. The balance of harms, as the district court found, weigh heavily against the entry of an injunction. On the one hand, we're talking about FAU's members' likelihood of success in any particular game, but if an injunction were to be entered, the harm to Doe, to the student, would be complete preclusion from participating in softball in her senior year. That's not just a harm to Doe. That's a harm to her team. That's a harm to her community. The record has declarations from teammates, from parents of other teammates, from her coach, all speaking to the team-based sport that softball is and how this team has risen and fallen together. And so to take Doe out of that equation for her senior year of high school, that is the irreparable injury. That's what's on the side of the balance of harms, and that's why the balance of harms weigh against entry of an injunction. To return where I started, Your Honors, whether to issue a preliminary injunction is a discretionary decision. The district court in this case did not abuse its discretion. There are no clear errors. There is no reason for this court to intervene, and for that reason we ask that the district court's order be affirmed. Thank you. Good afternoon, Your Honors. Let me, I'll try not to jump around too much, but let me start where Ms. McCallum left off, where she said that there was no abuse of discretion. This court has been crystal clear. District courts do not have discretion to get the law wrong, and that's what our appeal is primarily about. It's about the district court's legal analysis and its understanding of Title IX. And it got that incorrect. That's reviewed de novo. Once that comes clear, as I said, I think everything flows from that. Let me say a couple of things about the disparate impact issue. One is, I'll just note, we can't find a single case that has invalidated a claim based on the athletics regulations by saying that the athletics regulations make out a disparate impact claim. The understanding of courts throughout Title IX's history has been that if the claim is based on the athletics regulations as ours are, that's a disparate treatment claim for all of the reasons that I provided before. Alexander v. Sandoval is a particularly inapt case here, because for that case, that was about what language you're going to provide a driver's license test in. To get to something like this case, you would have to imagine that you already had a driver's license system that was separated on the basis of national origin, which you didn't. Here we had an athletic system that is separated already on the basis of sex, and then you're tinkering with that and intentionally injecting males into girls' sports. That's disparate treatment, not disparate impact. The fine arts and speech and debate example is particularly inapt. Those weren't separated by sex. They've never been separated by sex, as far as we can tell. Simply saying the policy wouldn't really affect that whatsoever. Last thing I'll say on this particular point is that there really is no dispute that boys' sports in Minnesota are open to all comers. It's on the face of the statute. Minnesota Statute 121A04 Subdivision 3D essentially says it. You have to assume, as you read that statute, that the previously excluded sex is women, but again, that's already been resolved by this court. We know that when a statute in Minnesota says that under DM, it's talking about women. Once you get that, it's on the face of the statute that boys' sports are open to all comers. I will say one more thing. The science on this issue is actually quite clear. I keep hearing my friends on the other side say that the science is unsettled, and it absolutely is not. Number one, the whole notion that we're going to worry about puberty blockers is a complete red herring here. The bylaws don't say anything about puberty blockers. They allow any male who identifies as female to play on girls' teams. That just doesn't come into the equation. The other thing I'll say is if you look at Dr. Brown's report, he cites, he recognizes that the evidence on that point is not as strong or as developed as it is for regular old testosterone suppression. But then he goes on to cite eight different peer-reviewed studies, showing that males retain an athletic advantage after taking puberty blockers. Eight. My friends on the other side have zero studies. Eight to zero seems like the science is pretty darn clear. Moving on again, apologies for jumping around a little bit. They're talking about athletic advantage. I just want to be clear. Athletic advantage is not a talisman. Athletic advantage is an advantage. That's why in Dr. Brown's report you see C.C. Telfer as a male goes from being sort of a top 100 runner to a top 10 runner. That doesn't mean that C.C. won every single race. Leah Thomas didn't win every single race. That's not how athletic advantage works. It's an unfair advantage that gives you a leg up. That's all. And I think that the evidence here of the sheer dominance that Doe had, I mean, you don't have someone pitch every single inning of a state championship tournament, 21 innings in like three days, unless they're the best pitcher you've got and they're the horse you want to ride. But doesn't that happen for almost every single team that plays in the state softball tournament? I think it, well, Your Honor, it simply demonstrates that that's the best player you've got. It happens to be a male. And then finally, I would say, as my time runs out, for purposes of injury, the Bost case resolves any standing issue that this court might have seen by noting that simply being forced to play in an unfair game is a sufficient injury under Article III. And I would urge the court to reverse the district court and enter a preliminary injunction. Thank you, counsel. The court appreciates the appearance and briefing of all counsel. The case is submitted and we will issue an opinion in due course. You may be excused. Ms. Bindler, does that complete our calendar for the week? That does, Your Honor. The court will be in recess until further call. Court is now adjourned.